FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.
★ DEC 10 2019 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
**ROBERT LEE WIGGINS,**

            Plaintiff,

    - against –

**THE GARDEN CITY GOLF CLUB a/k/a GARDEN CITY MEN'S CLUB d/b/a GARDEN CITY GC, and GEORGE OUELLETTE,**

            Defendants.

-------------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

17-CV-4270 (AMD) (SMG)

**ANN M. DONNELLY,** United States District Judge:

The plaintiff, Robert Lee Wiggins, brought this action against the Garden City Golf Club and caddy manager, George Ouellette, alleging violations of 42 U.S.C. § 1981 and New York State Human Rights Law §§ 296, *et seq.* (ECF No. 12.) The plaintiff also brought common law tort claims of battery and intentional infliction of emotional distress against Mr. Ouellette. (*Id.*) On April 22, 2019, the defendants separately moved for summary judgment. (ECF Nos. 52-3, 53-11.) For the reasons that follow, the defendants' motions are granted.

## BACKGROUND[1]

I. *The Garden City Golf Club.*

The Garden City Golf Club is a non-profit golf club located in Garden City, New York. (ECF No. 54-14, Pl.'s 56.1 Counter-Statement in Response to Garden City Golf Club ("Pl.'s 56.1

---

[1] In deciding whether summary judgment is appropriate, the Court resolves all ambiguities and draws all reasonable inferences in favor of the plaintiff, the non-moving party. *See Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008).

1

(Club)" ¶ 1.)[2] Golfers can either walk the golf course or drive in a golf cart. (*Id.* ¶ 4.) Golfers who walk typically use a caddy. (*Id.*) Caddies assist golfers by carrying their clubs, providing yardage distances to the hole or hazards, and locating the ball after it is hit. (*Id.* ¶ 7.) Caddies also maintain the golf course during play by raking sand traps, filling divots, and repairing ball marks on the green. (*Id.*)

Mr. Ouellette, a white man, began working at the golf club in 1995 as the starter and caddy manager. (ECF No. 55-12, Pl.'s 56.1 Counter-Statement in Response to Ouellette ("Pl.'s 56.1 (Ouellette)" ¶ 1.) As the starter, Mr. Ouellette organized when golfers began their rounds on the first tee. (*Id.*) As caddy manager, Mr. Ouellette assigned caddies to members upon members' request. (Pl.'s 56.1 (Club) ¶ 4.) Members could also contact caddies directly. (*Id.*)

The plaintiff, a black man, began working as a caddy for the club's members in 1996 or 1997. (Pl.'s 56.1 (Ouellette) ¶ 2.) The parties dispute whether the plaintiff was hired as an employee of the club, but agree for the most part about the factual history of the plaintiff's work. The plaintiff did not fill out an application, interview for the position, or otherwise enter into an agreement with the club about his caddying duties or schedule. (Pl.'s 56.1 (Club) ¶ 9.) He never received an IRS Form W-2 or Form 1099 from the club. (*Id.*) The club did not train the plaintiff, aside from having him walk the course with an experienced caddy before caddying by himself. (*Id.* ¶ 7.) The plaintiff brought his own tools to work—a range finder, green repair tool,

---

[2] On a motion for summary judgment, the Court's consideration is limited to factual material that would be admissible in evidence at trial. *Local Unions 20 v. United Brotherhood of Carpenters and Joiners of America*, 223 F. Supp. 2d 491, 496 (S.D.N.Y. 2002). Factual allegations that are disputed without a citation to admissible evidence are deemed admitted, as long as they are also supported by the record. Local Civ. R. 56.1; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003). Factual allegations that are not disputed are deemed admitted, as long as they are also supported by the record. *Id.* I disregard any arguments in the Rule 56.1 statements. *Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL 1435882, at *2 (E.D.N.Y. Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019).

and towel. (*Id.* ¶ 8.) The club enforced a dress code for caddies, and provided them with a club-branded hat. (*Id.*)

The golf club did not require the plaintiff to work a specific number of days or hours. (*Id.* ¶ 12.) He was free to choose when and how much he worked, and could also work at any other golf course, which he did on Mondays when the club was closed. (*Id.* ¶ 10.) Nevertheless, early on in the plaintiff's time at the club, Mr. Ouellette told him which days the club was open and what time golfers typically started in the mornings. (*Id.* ¶ 12.) Mr. Ouellette also told the plaintiff about special events, including tournaments, that would require caddies to be at the club at a specific time if they were interested in working the events. (ECF No. 66-1, Ouellette Dep. 56:15-58:3.)

The golf club did not pay the plaintiff a salary or give him a paycheck. (ECF No. 66-3, Pl. Dep. in 16-CV-5959 ("Pl. Wage Dep.") 156:20-157:9.) Rather, the member for whom the plaintiff caddied paid him at the end of the round. (Pl.'s 56.1 (Club) ¶ 15.) Members paid the plaintiff between $80 and $120 per bag carried. (*Id.* ¶ 15.)

While waiting for assignments, caddies congregated in the "caddy yard," an enclosed area next to the pro shop. (Pl.'s 56.1 (Ouellette) ¶ 3.) The caddies, including the plaintiff, played cards, watched television, ate, and napped in the caddy yard. (Pl.'s 56.1 (Club) ¶ 14.) The caddies frequently joked around, commenting on each other's clothing and hiding each other's clothing and gear. (Pl.'s 56.1 (Ouellette) ¶¶ 5-6.) Mr. Ouellette also socialized in the caddy yard and participated in the jokes. (*Id.* ¶ 7, Pl.'s 56.1 (Club) ¶¶ 16-17.)

The plaintiff had a good relationship with Mr. Ouellette, and thought he was a "good guy." (Pl.'s 56.1 (Ouellette) ¶¶ 33-34.) Mr. Ouellette "looked out" for the plaintiff, and gave him desired assignments and jobs ahead of other caddies who arrived before the plaintiff. (*Id.* ¶¶

3

36-37.) Mr. Ouellette attended the plaintiff's father's funeral, and the plaintiff attended Mr. Ouellette's mother's funeral. (*Id.* ¶¶ 38-39.) Before the events giving rise to this lawsuit, the plaintiff never heard Mr. Ouellette use any racial slurs toward him or any of the other African American caddies. (*Id.* ¶ 40.)

II. *The Incident.*

One morning in September of 2015, the plaintiff arrived at the club after a night of drinking, and fell asleep in a chair in the caddy yard. (*Id.* ¶ 13.) At some point that morning, Mr. Ouellette approached his brother, Michael Ouellette, a caddy who was sleeping in a chair nearby. (*Id.* ¶ 18.) Mr. Ouellette placed a dildo through the zipper of his pants and held it above his brother's face; his brother woke up and waived it away. (*Id.*; Pl.'s 56.1 (Club) ¶ 21.) Mr. Ouellette then approached the sleeping plaintiff and put the dildo close to his mouth; the parties dispute whether the dildo was touching the plaintiff's face. (*Id.* ¶¶ 8-10; Pl.'s 56.1 (Club) ¶ 21.)

Mr. Ouellette testified that he was joking around, and that the other caddies laughed. (Ouellette Dep. 90:19-94:11.) The plaintiff, who was asleep and did not react, acknowledged that Mr. Ouellette intended to be funny, but thought that the conduct was racist and generally disrespectful, regardless of race. (ECF No. 66-4, Pl. Dep. 204:6-9, 205:14-19.)

Ron Conyers, another black caddy, photographed the incident. (Pl.'s 56.1 (Ouellette) ¶ 24.) The parties dispute whether Mr. Conyers published the photograph on Facebook or any other social media website. (*Id.* ¶¶ 27-28.) The plaintiff suspects that Mr. Conyers posted the photo on Facebook to ruin Mr. Ouellette's life, because Mr. Ouellette banned Mr. Conyers from the club for threatening Mr. Ouellette's children. (*Id.* ¶¶ 25-26; Pl. Dep. 207:24-208:5.)

4

III. *After the Incident.*

The parties dispute whether the plaintiff continued to work after the incident. The plaintiff claims he stopped working at the club after he saw the photograph on Facebook in November of 2015. (Pl.'s 56.1 (Club) ¶¶ 28-29.) The defendants claim that the plaintiff voluntarily stopped working at the club in December of 2015. (*Id.*)

The plaintiff showed the photograph to his mother, who advised him to "hurt them in the pockets." (Pl.'s 56.1 (Ouellette) ¶ 32.) The plaintiff hired an attorney who sent a letter to the club alleging that the plaintiff was the subject of discrimination. (Pl.'s 56.1 (Club) ¶ 32.) The club investigated the plaintiff's allegations and suspended Mr. Ouellette during the investigation. (*Id.* ¶ 33.) The club found no merit to the plaintiff's claim of racial discrimination, but concluded that Mr. Ouellette's behavior was inappropriate. (*Id.* ¶ 35.) The club reduced Mr. Ouellette's salary for a period of time and required him to participate in sensitivity training. (*Id.*)

## LEGAL STANDARD

Summary judgment is appropriate only if the parties' submissions, including deposition transcripts, affidavits, or other documentation, show that there is "no genuine dispute as to any material fact," and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The movant has the burden of showing the absence of any genuine dispute as to a material fact. *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997) (citation omitted). A fact is "material" when it "might affect the outcome of the suit under the governing law," and an issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Barlow v. Male Geneva Police Officer Who Arrested Me on Jan. 2005*, 434 F. App'x. 22, 25 (2d Cir. 2011) (internal citations omitted). Once the moving party has met its burden, the party opposing

5

summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial. *Ethelberth v. Choice Sec. Co.*, 91 F. Supp. 3d 339, 349 (E.D.N.Y. 2015) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).

## DISCUSSION

### I. 42 U.S.C. § 1981

Section 1981 safeguards an individual's right to "make and enforce contracts" from racial discrimination. 42 U.S.C. § 1981. To fall within its scope of protection, a plaintiff must show that the defendant impeded one of his contractual rights, which include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C § 1981(b); *see Clark v. City of New York*, No. 13-CV-210, 2014 WL 4804237, at *2 (E.D.N.Y. Sept. 25, 2014). "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

To maintain a Section 1981 claim, a plaintiff must establish "(1) [that he] is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) [that] the discrimination concerned one or more of the activities enumerated in the statute.'" *Ludwig's Drug Store, Inc. v. Forest City Enterprises, Inc.*, No. 13-CV-6045, 2016 WL 915102, at *12 (E.D.N.Y. Mar. 4, 2016) (quoting *Bentley, Jr. v. Mobil Gas Station*, 599 F. App'x. 395, 396 (2d Cir. 2015) (citation omitted)).

The defendants do not dispute that the plaintiff is a member of a racial minority. Rather, they contend that they did not subject the plaintiff to discrimination or a hostile work environment because of his race. I agree that the defendants did not discriminate against the plaintiff on the basis of his race or subject him to a hostile work environment because of his race.[3]

Claims of discrimination under Section 1981 are analyzed using the *McDonnell Douglas* burden-shifting framework. *Bowen-Hooks v. City of New York*, 13 F. Supp. 3d 179, 209-10 (E.D.N.Y. 2014) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under the framework, the plaintiff must first establish a *prima facie* case of discrimination. *Id.* To establish a *prima facie* case of discrimination, the plaintiff must show that: (1) he is a member of a protected class; (2) he is qualified for the position; (3) he has suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *Id.* (quoting *Brown v. City of Syracuse*, 673 F.3d 141, 150 (2d Cir. 2012)).

Hostile work environment claims under Section 1981 are analyzed using the same standards used in Title VII cases. *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000). As under Title VII, a hostile working environment is established under Section 1981 when the workplace is "permeated with discriminatory intimidation, ridicule, and insult…that is sufficiently pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted). "Isolated, minor acts or occasional episodes do not warrant

---

[3] The club separately argues that the plaintiff cannot maintain a Section 1981 claim because he did not have a contractual relationship with the club. Because I find that the defendants did not discriminate against the plaintiff on the basis of his race, I do not reach the issue of whether the plaintiff had a contractual relationship with, or was an employee of, the golf club. The plaintiff's employment status with the club is an issue before the Honorable Roslynn R. Mauskopf in an FLSA class action lawsuit captioned *Robert Lee Wiggins v. The Garden City Golf Club*, No. 16-CV-5959.

7

relief...a plaintiff must still prove that the incidents were 'sufficiently continuous and concerted' to be considered pervasive, or that a single episode is 'severe enough' to establish a hostile working environment." *Brennan v. Metropolitan Opera Ass'n, Inc.*, 192 F.3d 310, 318 (2d Cir. 1999) (internal citations omitted). In evaluating a hostile work environment claim, the court looks to the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) (quoting *Harris*, 510 U.S. at 23).

A work environment will be considered hostile if "a reasonable person would have found it to be so and if the plaintiff subjectively so perceived it." *Brennan*, 192 F.3d at 318 (citation omitted). Finally, it is "axiomatic that in order to establish a [race-based] hostile work environment under [Section 1981], a plaintiff must demonstrate that the conduct occurred because of [his]" protected status. *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002).

The plaintiff has not raised a triable issue of fact as to the existence of a race-based hostile work environment. Mr. Ouellette's behavior was sophomoric, offensive, and disrespectful, but there is no evidence that he was motivated by racial animus. The undisputed evidence shows that although the caddies and Mr. Ouellette were grown men, they frequently behaved like adolescents; they mocked one another's clothing and hid one another's clothing and equipment around the yard. The evidence establishes that Mr. Ouellette did not single the plaintiff out with the dildo stunt—he did the same thing to his brother minutes before. Mr. Ouellette testified that he was joking, and the plaintiff agreed that Mr. Ouellette probably meant to be funny; the plaintiff felt that his conduct was disrespectful for an "African-American, white American, any type of American." (Pl. Dep. 205:14-19.)

The undisputed evidence demonstrates that Mr. Ouellette targeted the plaintiff because he was sleeping, not because he is black. *See Alvarado v. Nordstrom, Inc.*, 685 F. App'x. 4, 6 (2d Cir. 2017) (defendants' harassing behavior towards African-American employees suggested that her behavior toward the plaintiff, a Hispanic male, was "not racially-motivated but was simply the result of her being a combative individual.") (summary order). While the conduct was crude, it was not discriminatory. *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 104 (2d Cir. 2001) (anti-discrimination law "does not make [defendants] liable for doing stupid or even wicked things; it makes them liable for *discriminating*.") (emphasis in original) (quoting *Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998)).

The plaintiff argues that a white man posing with a dildo in a black man's face can reasonably be perceived as racially hostile conduct when viewed in a historical context. Courts can and often do look to historical context when evaluating conduct alleged to have created a hostile work environment. *See generally Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir. 2013) (Kavanaugh, J., concurring). For example, courts have found that nooses and dolls resembling monkeys create hostile work environments because they are "powerful symbols of racism and violence against African Americans." *Toomer v. Carter*, No. 11-CV-02216, 2016 WL 9344023, at *18-19 (D.D.C. Mar. 24, 2016) (collecting cases) (citation omitted), *report and recommendation adopted sub nom., Toomer v. Mattis*, 266 F. Supp. 3d 184 (D.D.C. 2017). It may very well be, as the plaintiff maintains, that "cultural tropes of black men as rapists" and "hypersexualized animals to be tamed" remain powerful symbols of racism in America. (ECF No. 54 at 12-13.) But the link between Mr. Ouellette's concededly juvenile and crass behavior and "cultural tropes of black men as rapists" is too tenuous to render his conduct capable of creating an objectively hostile work environment on its own. *Contra Williams v. New York City*

*Housing Authority*, 154 F. Supp. 2d 820, 824 (S.D.N.Y. 2001) ("Indeed, the noose is among the most repugnant of all racist symbols, because it is itself an instrument of violence," specifically "this nation's opprobrious legacy of violence against African-Americans.").

Even if the plaintiff had established race-based animus on Mr. Ouellette's part, the conduct was not "severe" or "pervasive" enough to create a hostile work environment. There was only one incident in 2015, and the record is devoid of any other instances of racial hostility by Mr. Ouellette or any other caddies or club employees. An isolated act is not pervasive and does not establish a hostile work environment. *Whidbee*, 223 F.3d at 69 ("Incidents that are few in number and that occur over a short period of time may fail to demonstrate a hostile work environment.").

Nor was Mr. Ouellette's behavior severe enough to create a hostile work environment on its own. Courts have observed that while "[t]here is no 'magic number' [of racially offensive conduct] that gives rise to an actionable hostile environment claim...[g]enerally, the more severe the conduct, the fewer occurrences necessary to create a hostile work environment." *Toomer*, 2016 WL 9344023, at *19 (citations omitted). A review of Second Circuit jurisprudence in this area makes clear that "when conduct in the workplace is physically threatening to an individual because of his membership in a protected class, that conduct will almost always create a hostile work environment." *Williams*, 154 F. Supp. 2d at 825 (collecting cases). Even if one assumes that Mr. Ouellette's act was imbued by history with racial animus, it was not physically threatening, and therefore, cannot have created a hostile work environment standing alone.

In short, Mr. Ouellette's behavior falls short of the persistent, egregiously offensive conduct found in other cases to support a hostile workplace claim. It was not accompanied by overtly racist remarks or racial epithets. *See Toomer*, 2016 WL 9344023, at *18 ("Several courts

have addressed hostile work environment claims involving the display of racially offensive dolls and nooses. Cases where the court has found a viable claim typically involve a panoply of racist conduct, including degrading comments and racial epithets, of which the doll or noose is only one component part."); *Tademy v. Union Pacific Corp.*, 614 F.3d 1132, 1144 (10th Cir. 2008) (repeated use of racial epithets and other egregiously racist statements directed at the plaintiff which culminated in display of life-size, realistic noose prominently displayed in work area). It was not repeated or threatening. *Williams*, 154 F. Supp. 2d at 824.

Accordingly, the Section 1981 claim against Mr. Ouellette is dismissed.[4] Because the plaintiff has not established severe or pervasive harassment, the Section 1981 claim against the Garden City Golf Club is dismissed as well. *Whidbee*, 223 F.3d at 72 ("To prevail on their [Section] 1981 claims the plaintiffs must show not only severe or pervasive harassment but also 'a specific basis...for imputing the conduct that created the hostile environment to the employer.'") (citation omitted).

## II. State Law Claims

I decline to exercise jurisdiction over the plaintiff's state law claims. "Where a court dismisses all claims over which it has original jurisdiction, it may, in its discretion, decline to exercise supplemental jurisdiction over remaining claims." *Wolfinger v. Consolidated Edison Co. of New York, Inc.*, No. 17-CV-1710, 2018 WL 3637964, at *12 (E.D.N.Y. July 31, 2018) (citing 42 U.S.C. § 1367(c)(3)). In deciding whether to exercise supplemental jurisdiction, district courts should balance the values of judicial economy, convenience, fairness, and comity. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless

---

[4] The parties focused only on the hostile work environment theory of discrimination. Therefore, I do not analyze the disparate impact theory of discrimination under the *McDonnell Douglas* framework. Nevertheless, for the reasons articulated in this section, the plaintiff has not raised a triable issue of fact as to "an inference of discrimination," as required by *McDonnell Douglas*.

decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."); *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 123 (2d Cir. 2006) ("[F]ederal policy concerns may argue in favor of exercising supplemental jurisdiction even after all original-jurisdiction claims have been dismissed."). Having dismissed all federal claims in this action, I decline to exercise supplemental jurisdiction over the plaintiff's remaining state law claims. *See Chenesky v. New York Life Ins. Co.*, 942 F. Supp. 2d 388, 391 (S.D.N.Y. 2013) ("Ordinarily, when a plaintiff's federal claims are dismissed before trial, the state law claims should be dismissed as well.") (quoting *Brzak v. United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (internal citation omitted)).

## CONCLUSION

The Court grants summary judgment for the defendants on the federal claims, and declines to exercise supplemental jurisdiction as to the remaining state law claims. The Clerk of Court is respectfully directed to close this case.

**SO ORDERED.**

s/Ann M. Donnelly
_____
Ann M. Donnelly
United States District Judge

Dated: Brooklyn, New York
December 9, 2019